489 So.2d 942 (1986)
Gerald H. LABIT
v.
John E. SETIFF, the Louisiana Department of Transportation and Development for the State of Louisiana and the Travelers Insurance Company.
No. 85-CA-586.
Court of Appeal of Louisiana, Fifth Circuit.
May 12, 1986.
*943 Anthony S. Taormina, Metairie, for Gerald H. Labit plaintiff-appellee.
James J. Morse, New Orleans, for La. Dept. of Transp. and Development for State of La., and Travelers Ins. Co. defendants-appellants.
Before BOUTALL, KLIEBERT and GAUDIN, JJ.
BOUTALL, Judge.
In this personal injury suit, defendants, The Department of Transportation and Development, State of Louisiana, and its insurance carrier, The Travelers Insurance Company, appeal a damage award totalling $1,276,744.00 to the plaintiff.[1] The only issue on appeal is whether the trial judge abused his discretion in setting the amount of the award.
The plaintiff, Gerald H. Labit, was injured when his van was struck from behind on April 6, 1982 by an 18 wheeler owned by the Department of Transportation.[2] The accident occurred when the truck's brakes failed to work and this was not contested at trial. Following the accident, plaintiff filed suit seeking damages for injury to his spine, stomach disorders, psychological problems, and impotence.
On appeal defendants contend the award is excessive to the extent it is not supported by the evidence. The award was itemized in the trial judge's reasons for judgment as follows:

"A) Physical pain and
 suffering, past and
 future................ $250,000.00
B) Mental pain and
 suffering, past and
 future................ 125,000.00
C) Impotency............... 125,000.00
D) Lost income, past and
 future................ 653,440.00
E) Medical expenses........ 123,304.00
 ____________
 TOTAL $1,276,744.00"

*944 While the appellants contest all items of the award, the major thrust of their appeal is directed to the award for loss of income, past and future. Accordingly, we shall consider the issues in the order in which they are discussed in the brief.
The plaintiff was 44 years old at the time of the accident, married, and father of six children. He had learned the trade of carpet laying about two years earlier and in January, 1982 he had started his own business laying carpet with his son as helper, the two sharing the profits 60%/40%. Labit had a fifth grade education but could not read or write. His wife handled all the paper work for the business. Before learning the carpet laying trade, Labit had performed a variety of odd jobs and had not held a steady job; however, the record indicates that he was a skillful, conscientious, and reliable craftsman in his current occupation. He was en route to a job when the accident occurred. For several months thereafter he continued the business by supervising his son and a second helper, but after he had surgery the business collapsed because the son was insufficiently experienced to manage alone.
As Labit's physical condition and earning capacity are inextricably related, we summarize briefly his medical history. He had had no other serious accidents, other than an injury to a hand twenty-five years earlier. He experienced back pain within a few days of the accident, was treated conservatively from April 21, 1982 until September 16, 1982, when he underwent removal of a herniated lumbar disc and a lumbar spine fusion. While the surgery cured the disc problem, the fusion failed. At time of trial, Labit was experiencing pain in walking and sitting. His legs were weak and gave way at times. He is medically restricted from performing heavy lifting, long sitting or standing, or repetitive bending or stooping.
Along with his back problems Labit has also experienced stomach pain, impotency problems that resulted in surgery for a penile implant, and depression for which he has been treated by a psychiatrist since June, 1984.
Lost Past and Future Wages
The trial judge awarded plaintiff $85,170.00 as past lost wages and $568,370.00 for future lost income.[3] The court held that Labit is unable to do any physical labor and is unable to earn a living in a sedentary job because of his limited education.
Dr. Charles Billings, Labit's orthopedic surgeon, testified that a second attempt at spinal fusion might be indicated. The appellants interpret Dr. Billings' statement that he was "optimistic that there would be improvement in his symptoms and that a fusion could be achieved" to mean he was strongly recommending surgery and that Labit would be employable after a period of recuperation. Other portions of the physician's testimony indicated that only under certain circumstances would he operate again:
"... I think there's probably about a fifty-percent chance that future surgery would be required to control the symptoms. The studies, that is if a repeat CAT-Scan is done and discloses no dramatic evidence of any recurrent disc herniation problems at new levels, my primary concern clinically is concerning that of the stability of the lower spine when there's been resorbtion of the fusion material placed. Now, if his symptoms persist and are of such a severe magnitude that medicines and medications required and significant restrictions in activities, then I think repeat surgery could improve his discomfort."
As to Labit's employability following a successful fusion, the transcript reads as follows:
"Q. And onceand if that fusion is successful, that would remove any of the restrictions you talked about a moment ago about his ability to go *945 back and earn some gainful employment, is that correct?
"A No, the restrictions would remain permanent and would be in effect from the initial injury or the initial insult to the spine and would not change with a successful surgical result."
Dr. Billings stated that, taking into account Labit's illiteracy:
"I think it would be unlikely that he could be capable of gainful employment now and probably for the prolonged future."
The appellant's witness, Diane McIlwain, a rehabilitation consultant, postulated from the record, including Dr. Billings' earlier deposition, that there were certain minimum wage occupations, including alarm signal operator, shipper, dental ceramics assistant, and gate tender, in which Labit could perform within his physical restrictions. On cross examination she agreed that if the treating physician felt at time of trial that Labit was unemployable that would affect her evaluation. In the absence of any rebutting medical testimony as to Labit's present and future physical condition, we find that the trial judge was correct in concluding that Labit is permanently disabled.
The court accepted the estimated lost wages figures of the plaintiff's economist, Dr. Melville Wolfson, rather than those of the defendants', Dr. Kenneth Boudreaux. In his reasons for judgment the trial court said:
"... Dr. Boudreaux's figures fail to take into consideration the increased income Mr. Labit stood to gain as a result of the business Mr. Labit would have been guaranteed from Bon Marche'. Mr. Giardina testified that Mr. Labit could have gotten all of the Bon Marche' carpet business he could have handled, and that future prospects looked bright as well. Therefore using as a base figure the expenditures by Bon Marche' to carpet mechanics in 1984 as well as expected other income, after subtracting for expenses and taxes, Dr. Wolfson's estimate of $568,370 for loss of future earning capacity until the end of Mr. Labit's tabular worklife, appears eminently reasonable and more probable than not.
"The past loss of $85,170 is derived from Dr. Wolfson's estimated 1982 income if Mr. Labit had not been injured. This is a middle of the road figure and appears to be the best indication of the average income Mr. Labit would have earned since the date of the accident until trial, but for Mr. Labit's severe injuries. Dr. Boudreaux's failure to take into consideration the fact that Mr. Labit's business would, more probably than not, have greatly increased in profitability, invalidates his calculations as to past and future lost earnings and leads the Court to adopt the findings of Dr. Wolfson."
The standard for appellate review of future loss of earnings was set out by the Supreme Court in Robinson v. Graves, 343 So.2d 147 (La.1977), at 149, as follows:
"Future loss of earnings cannot be calculated with absolute certainty; this court has recognized that damages for the loss of future earnings are somewhat speculative in character. See e.g., Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968). Absent an abuse of discretion by the trier of fact, however, this degree of uncertainty does not permit the reviewing court to substitute its judgment for that of the trial court merely because the reviewing court believes that a different award would have been more appropriate. As this court stated in Bitoun v. Landry, supra [302 So.2d 278 (La.1974) ]:
`... The question is not whether a different award might have been more appropriate, but whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it....'"
Dr. Wolfson calculated three base wages from which he estimated both past lost wages for 2.39 years from April, 1982 until January, 1985, and future lost wages. The first was derived from the gross receipts *946 shown on the Labits' tax return for 1982, and the other two from the gross expenditures of Bon Marche Furniture Company (Labit's primary source of work) for carpet laying in the years 1982 and 1984 respectively. He assumed Labit would have handled 85% of Bon Marche's work and would have had revenues of $13,000 from other accounts.
In arriving at the figure for past wages of $85,170 adopted by the court, Wolfson used a base figure of $44,545, using Bon Marche's gross for 1982 and then deducting $2,000 for car and truck expenses, 8% for supplies, and income tax. Labit's share of the net was then figured at 60%. In estimating future loss of $568,370, Wolfson applied a wage base of $53,145, using Bon Marche's gross for 1984 and the same deductions for vehicle expense and supplies, and applying 60% to the net. He then assumed a work life of 14.9 years from date of trial (to age 61.7 years), an annual increase of earning capacity of 6%, which after adjustment for age would be 5.5%, a discount rate of 7.5%, and income tax liability.
The appellants challenge all assumptions of Dr. Wolfson regarding the figure adopted by the court except the percentage increase in earning capacity.
They first dispute the assumption that Labit would have been given 85% of Bon Marche's work indefinitely. Mr. Lloyd Giardina, owner of Bon Marche, testified that Labit was a good, reliable carpet mechanic who could do complicated fitting to the client's satisfaction, that such mechanics were not plentiful, and that Labit would have had first call for all their work if he had not been injured. However, Giardina stated that to keep up with the volume of work, which varied from month to month, Labit would have had to supervise more than one employee. The appellants argue that Labit could never have handled 85% of the work and that in 1983 and 1984 Bon Marche had two "prime" mechanics. We note in Giardina's testimony that those men handled flooring in addition to carpeting. Labit testified to having worked six to seven days a week and some nights before his injury. The appellants also oppose the inclusion of estimated receipts of $13,000 from work for clients other than Bon Marche. During the period from January, 1982 until April 8, 1982 Labit had earned over $3,000 from other customers. Labit testified that after the accident he could no longer do the pattern-matching that was required by Howard Johnson, a large account. The son attempted to do it but had insufficient skill and lost the account. Accordingly, we find that the record supports the trial judge's belief that Labit would have continued to receive the bulk of Bon Marche's business as well as work from other sources.
The appellant's economist, Dr. Kenneth Boudreaux, arrived at a lower wage base, $20,851, using the invoices submitted to Bon Marche and the other clients from January 15 through September 10, 1982, and annualizing the gross to be $53,000 for that year. His estimates of expenses were considerably higher than those of Wolfson and included vehicle insurance, workers' compensation, and employer's contribution to Social Security, none of which the Labits had paid in 1982. In calculating future loss, Boudreaux applied an 11.4% discount rate, the interest then available on U.S. Treasury Bonds.
The court accepted Wolfson's 7.5% discount or investment return rate rather than Boudreaux's 11.4%. In Unbehagen v. Bollinger Workover, Inc., 411 So.2d 507 (La.App. 1st Cir.1982) the court accepted an 8% discount rate, rejecting an 11% rate, and noted that its review of jurisprudence indicated rates of 4% to 11% had been used. In Philippe v. Browning Arms Co., 395 So.2d 310, on rehearing (La.1981), a discount rate of 7% was accepted. As interest rates on U.S. Treasury bonds and bills as well as on other investments vary, the choice of discount is discretionary with the finder of fact. Although the courts assume that only safe investments should be considered, they are not bound to use long term Treasury securities as a guide and we accept the 7.5% rate as reasonable.
*947 While we find that the trial court was correct in accepting Wolfson's estimates of Labit's gross earnings and his assumption of a 7.5% discount rate, we believe that Wolfson's estimate of expenses was based on incorrect data and was clearly wrong. Mr. and Mrs. Labit's testimony indicate that he was unable to deal with any paper work at all and her bookkeeping system was relatively unsophisticated. She testified that some records were unavailable and that she had given Labit cash with which to pay for gasoline and other out of pocket expenses. It was Mr. Labit's habit simply to cash his checks as received and hand over 40% to his son after deducting expenses. In the months between the accident and his surgery, after paying a helper in cash, he and his son split the receipts 50/50. He made no withholding for his employees.
The van Labit was using belonged to a friend who agreed to sell it to him but allowed him to defer making payments on it until the business built up. Wolfson allowed only $2,000 for all vehicle expenses, based on Labit's figures for out of pocket expenses, while the profit or loss schedule from the 1982 income tax form showed a deduction of $7,023 for car and truck expenses. The plaintiff entered into evidence an exhibit showing primarily van rental and repair of $4,308.89 for the period April 12 to August 31, 1982. It is unrealistic to believe that Labit could continue the business with a borrowed vehicle. He would have to purchase or lease a vehicle, so that the figure appearing on the tax form is more nearly accurate than Wolfson's figure for out-of-pocket expenses alone. We agree with the defendants' economist that Labit would have had such additional expenses as insurance, workers' compensation, and social security, but the record furnishes insufficient information for computing them.
As the record does furnish in the tax return a reasonable figure for vehicle expenses, we amend the awards to reflect a deduction of $7,000 instead of $2,000. We amend and reduce the award for past lost earnings to $79,570 and that for future lost earnings to $514,740, yielding a total of $594,310.

Physical and Mental Pain and Suffering
The appellant contends that the award of $375,000 for pain and suffering is excessive and unjustified, as future surgery will improve the plaintiff's symptoms, both mental and physical, and he will not have a lifetime of misery. As discussed above in relation to permanent disability, the treating orthopedist was hopeful that a second fusion might be successful and alleviate some pain but not remove the restrictions on his activity. He would only operate after a careful reevaluation of his patient and had not urged repeat surgery. He estimated a 50:50 chance of success. A plaintiff's recovery will not be limited simply for his refusal to undergo medical treatment that promises limited success. Jacobs v. New Orleans Public Service, Inc., 432 So.2d 843 (La.1983).
The testimony of Labit and of his wife indicates that before the accident he enjoyed physical recreational activities such as bowling, baseball, volleyball, swimming, and playing with his six children. He and his wife had a pleasant social life that included deep sea fishing, dancing, bus trips to games, none of which are possible now. Mrs. Labit testified that he aged greatly, was hardly the same person and no longer an affectionate man who hugged her and the children frequently. She sought psychiatric help for him when he became so depressed that he stopped bathing and shaving. The treating psychiatrist, Dr Oliver Sanders, testified that he was in a profound depression. We agree with our brothers' statement in Thibodaux v. Acme Truck Lines, Inc., 443 So.2d 716 (La.App. 5th Cir.1983), at 718, as follows:
"... [A]s stated in Reck v. Stevens, 373 So.2d 498, 501 (La.1979), the initial inquiry must always be directed at whether the trier's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion." *948 In this case the record indicates that the damage from the accident has had a profound negative effect on nearly all aspects of the plaintiff's life and we affirm the total award for pain and suffering of $375,000.
Award for Impotence.
The plaintiff's orthopedist referred him to Dr. Neil Baum, a urologist, shortly before the back surgery because of his complaints of difficulty achieving and maintaining an erection. From an exhaustive series of tests Dr. Baum concluded that the origin of the problem was physical rather than psychological. He based this judgment on the results of a nocturnal penile tumescence test, which indicated that Labit had no spontaneous erections during sleep. When Labit returned after recovery from his back surgery, complaining of continuing erectile dysfunction, Dr. Baum conducted further tests and recommended a surgical penile implant. Such a device allows a man to produce an erection artifically. The implant does not, as the defendants appear to believe, remove the impotence and is not a substitute for normal male functioning. As the husband and wife both testified to having maintained a satisfactory sex life prior to the accident, there is nothing in the record to suggest that the dysfunction was not related causally to the accident. Accordingly, we agree with the trial judge's conclusion that it was and affirm the award for loss of sexual function.
Special Damages for Medical Treatment.
The defendants contend that the evidence does not support this award, which was apportioned as follows:

Future psychiatric treatment...... $ 37,126.00
Future treatment from Dr. Srinivas 8,360.00
Future treatment from Dr. Billings. 10,588.00
Future drug bills.................. 16,380.00
Future surgery..................... 17,000.00
Past medical bills................. 32,000.00
Past prescription drugs............ 1,850.00
 ___________
TOTAL.............................. $123,304.00

They argue that the plaintiff has failed to relate the stomach disorders for which he was treated by Dr. Dasharathy Srinivas to the accident. While Dr. Srinivas did not state categorically a cause for Labit's gastritis and duodenitis, he did testify that some of the gastritis might be linked to nonsteroidal and anti-inflammatory drugs which were prescribed for his back problem. The defendants also question the expenses related to Labit's penile implant for lack of a showing of causal relationship. As the record provides support for the trial court's finding that both the stomach and the genito-urinary problem were related to the accident, we find no abuse of discretion. The physicians whose future treatment was provided for in the award all testified as to the type and cost of treatment they predicted Labit would need in the future. In the absence of evidence to rebut their testimony, we affirm the award for past and future medical expenses amounting to $123,304.
Accordingly, for the reasons stated above, we amend that portion of the judgment appealed from which awards lost income, past and future, in the amount of $653,440 and decrease the award to $594,310. In all other respects, the judgment appealed from is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] In an amended judgment, Travelers was held liable in solido with the Department to the extent of its policy limits of $300,000.
[2] Defendant John Setiff, driver of the 18-wheeler, was dismissed from the suit via partial judgment in his favor, and that dismissal has not been appealed.
[3] The total amount of this award as stated in the judgment is 653,440.00 but should be $653,540.00. No one has complained of this error.